1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8

9  MICHAEL HUGHES,

10          Plaintiff,

11    v.

12  LOUIS DEJOY, Postmaster General,

13          Defendant.

Case No. C21-906-RSL

ORDER GRANTING
DEFENDANT'S MOTION
FOR SUMMARY
JUDGMENT

14

15    This matter comes before the Court on the defendant's "Motion for Summary Judgment"

16  (Dkt. # 26). The Court, having reviewed the submissions[1] of the parties and the remainder of the

17  record, finds as follows:

18    **I.    Factual Background**

19    Plaintiff Michael Hughes is a 61-year-old African American male who worked as a Mail

20  Processing Clerk at the United States Postal Service ("USPS"). Dkt. # 37, Ex. 3 ¶¶ 1, 2. Plaintiff

21  has physical challenges due to degenerative joint disease affecting his shoulders as well as lower

22

---

23    [1] Plaintiff's opposition does not comply with the local rules. It lacks appropriate citations to the
24  record and a word certification as required by Local Rules 10(e)(6) and (e)(3), respectively. Plaintiff
    also filed two duplicate oppositions to defendant's motion for summary judgment (Dkts. # 36, # 37),
25  each with different exhibits. Because the oppositions are identical, the Court considers only the later
    filed brief, Dkt. # 37. The Court did not consider exhibits not cited as it is "not required to comb the
26  record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified
    Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotations omitted). The Court will consider the
27  noncompliant opposition but cautions plaintiff that future failures to adhere to the rules will result in
    sanctions under Local Rule 11(c).
28

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 1

back strain and pain from various ailments mainly affecting his knees and ankles. *Id.* ¶ 13. He also complains of hip pain, recurring sprains, and unspecified injuries dating back to 1995. *Id.* His conditions were deemed as ongoing and permanent medical disabilities. *Id*. ¶ 14. Due to his disabilities, plaintiff requested and received accommodation and was placed on permanent light duty. Dkt. # 1 ¶ 2.20; Dkt. # 28 ¶ 8. The present lawsuit arises from two incidents: (1) ongoing issues between plaintiff and his co-worker, Brian Warden, a white male, and (2) attendance issues in 2016.

### A. Issues Between Hughes and Warden

#### i. History

Hughes and Warden began working together in 2011 and got along well until November 2013 when they ran against each other for union president. Dkt. # 27, Ex. 1; *id*., Ex. 2 at 5. Both employees were union stewards[2] and agreed that whoever won the election would select the other to be his vice president. *Id.*, Ex. 1; *id*., Ex. 2 at 5. Warden won the election but did not appoint Hughes as vice president because the two disagreed about union-related matters. *Id*., Ex. 2 at 5–6. Shortly after the election, Hughes and Warden's relationship worsened. Hughes allegedly spread a rumor about Warden having an affair with a co-worker. *Id.*, Ex. 6. He also lodged a complaint against Warden to the Plant Manager, Patrick McNally, for leaving mail in the "stackers," creating extra work for Hughes. *Id.*, Ex., 1 at 22; *id*., Ex. 5 at 3. He showed McNally a picture of the mail that Warden allegedly left behind. *Id.*, Ex. 1 at 22. McNally warned Hughes not to take pictures of the mail because it violated USPS policy. *Id*., Ex. 1 at 22; *id.*, Ex. 5 (USPS policy prohibiting using a camera to "capture legible images of mail").

On August 21, 2014, Warden resigned as union president, largely citing disagreements with Hughes and the affair rumors. Dkt. # 27, Ex. 6. On September 18, 2014, before Warden's resignation was effective, he terminated Hughes as union steward. *Id.*, Ex. 7. In the termination letter, Warden cited several reasons, including that Hughes threatened to file charges against the

---

[2] A union steward is a union member who represents and defends the interests of his or her fellow union members. USPS has no control or influence over the union's membership, appointment to positions, and dismissal of stewards. Dkt. # 29 ¶¶ 14, 17–18.

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 2

1    president (Warden), was disloyal to the union, violated USPS policy by taking photos of mail,

2    and on multiple occasions, was "openly, aggressively, antagonistic to [a] co-steward and

3    President," failed to attend mandatory quarterly meetings without prior approval, and repeatedly

4    used racial slurs, including phrases describing his co-workers as "little fucking Asians." *Id.*

5    Warden also called Hughes "disloyal, racist, violent, uncooperative, insubordinate, and a

6    snitch." *Id.* at 5.

7           After terminating Hughes, Warden asked him to return the keys to the union office, to

8    which Hughes responded by slowly taking the three keys off the key ring and throwing them in

9    different directions across the concrete floor. *Id.*, Ex. 8. Warden had to get on his hands and

10   knees to retrieve the keys. *Id.*, Ex. 8 at 5–6. The relationship continued to worsen, and McNally

11   instructed the men not to contact each other. *Id.*, Ex. 10.

12                    ii.    **Physical altercation**

13          On October 18, 2014, Hughes and Warden violated the no contract order and got into a

14   physical altercation at work. Dkt. # 27, Ex. 19. Managers intervened, separated the two, and

15   launched an investigation. *Id.* Hughes sustained no injuries, but Warden was left with bleeding

16   scratch marks on his neck. *Id.*, Ex. 12. It is unclear who the initial aggressor was, but one

17   eyewitness saw Hughes backing up while Warden had his hands up. *See id.*, Ex. 22 at 2.

18          Based on the findings of the investigation, USPS issued Hughes a 7-day suspension for

19   failure to follow instructions by failing to abide by the no-contact directive. *Id.*, Ex. 23. Warden

20   received a notice of removal for misconduct. *Id.*, Ex. 24; *see also* Dkt. # 28 ¶¶ 23, 28. Both

21   employees challenged their discipline through a formal grievance process. Hughes's 7-day

22   suspension was reduced to a letter of warning that was removed from his file after six months,

23   and Warden's suspension was reduced to a 14-day suspension and a last-chance agreement that

24   gave Warden the option to either improve his behavior or be terminated. Dkt. # 27, Ex. 25; *id.*,

25   Ex. 26; Dkt. # 28 ¶ 30.

26          After the fight, Wesley Shimaura, Hughes's attendance supervisor, emailed his former

27   assistant sharing details of the incident, referring to Hughes and Warden as "Dumb and

28

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 3

1    Dumber" and "knuckleheads."[3] Dkt. # 27, Ex. 27 at 5. Hughes and Warden had no further

2    incidents. Dkt. # 28 ¶ 37. They did not complain about the other's conduct again. *Id*.

3                    iii.    **Attendance Issues**

4            On September 30, 2016, USPS issued Hughes a letter of warning because he accumulated

5    40 hours of unscheduled absences in a three-month period and had failed to get his Family and

6    Medical Leave Act ("FMLA") status approved. Dkt. # 27, Ex. 29. Hughes challenged the letter

7    because he believed his lack of notice was excused by the FMLA or the Uniformed Services

8    Employment and Reemployment Rights Act as a veteran. Dkt. # 27, Ex. 30. The Distribution

9    Operations Supervisor ("DOS") testified that he issued the letter of warning according to

10   company policy, which provides that every employee, regardless of disability, has to request

11   leave via written request and give advanced notice for doctor visits. Dkt. # 1, Ex. 2 at 6. When

12   an employee accumulates 40 hours of unscheduled absences, USPS issues a letter of warning.

13   *Id*. In early 2017, Hughes negotiated an agreement requiring him to request leave before medical

14   appointments, and USPS rescinded the letter of warning soon after. Dkt. # 27, Ex. 1; *id.*, Ex. 30.

15                   iv.    **EEOC Proceedings**

16           Hughes filed two timely complaints with USPS's Employment Opportunity (EEO) Office

17   to investigate four claims: (1) on various dates since August 24, 2014, Hughes was harassed by

18   a coworker, Warden; (2) on October 20, 2014, Hughes was subjected to an investigative

19   interview following the fight with Warden, which culminated in a notice of seven-day

20   suspension dated December 13, 2014; (3) on September 30, 2016, Hughes received a letter of

21   warning for Unsatisfactory/Irregular Attendance, and was threatened with more severe

22   discipline; (4) on an unspecified date in January or February 2017, Hughes was required to give

23   notice prior to any medical appointment that might result in his being unable to work his next

24   shift. Dkt. # 1, Ex. 1 at 2.

25

26

27           [3] Hughes did not know about the email until it was produced in EEO proceedings. Dkt. # 28 ¶

28   38; *see also* Dkt. # 37 at 13.

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 4

1    An Administrative Judge granted summary judgment in favor of USPS on all four claims.

2  *See id*. Hughes appealed, and the Equal Employment Opportunity Commissioner's Office of

3  Federal Operations ("EEOC") affirmed. *Id*. Hughes sought reconsideration, which was also

4  denied because no reasonable fact finder could find in Hughes's favor. *Id.*, Ex. 2 at 4.

5    In addition to his own EEO complaints, Hughes was involved in two other employees'

6  EEO proceedings. First, sometime in 2013 or 2014, Hughes was deposed twice in connection

7  with grievances filed by Cynthia Rimmer, a disabled African American veteran. Dkt. # 27, Ex. 1

8  at 11–12; Dkt. # 37, Ex. 3 ¶¶ 6, 7. The first grievance concerned USPS's failure to accommodate

9  Rimmer's disability, and the second concerned allegations of disparate treatment and attendance

10 issues. Dkt. # 37, Ex. 3 ¶¶ 6, 7. Warden, as union president, was Rimmer's EEO representative

11 in at least one of those grievances. Dkt. # 27, Ex. 48 at 4.[4]

12   Second, in 2013, Hughes represented Mark Tucker, an African American employee with

13 disabilities, in filing two grievances. Dkt. # 37, Ex. 3 ¶¶ 4, 5. The first grievance concerned a

14 letter of warning related to performance issues and failure to follow instructions, and the second

15 concerned a notice of suspension for unscheduled absences. *See* Dkt. # 36, Ex. 4; *id*., Ex. 5.[5]

16   **II.   Analysis**

17   **A.  Summary Judgment Standard**

18   Summary judgment is appropriate when, viewing the facts in the light most favorable to

19 the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled

20 to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of

21 establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317,

22 323 (1986). Once the moving party has satisfied its burden, it is entitled to summary judgment if

23 the non-moving party fails to designate "specific facts showing that there is a genuine issue for

24

---

25   [4] There is little evidence reflecting the extent of Hughes's involvement, the timing of the EEO

26 proceedings, management's knowledge of Hughes's involvement, among other details.

27   [5] Hughes briefly mentions that he was involved in an EEO proceeding with Sandy Kwong. *See*

28 Dkt. # 37, Ex. 3 at 4. The Court could not find any evidence relating to Kwong's complaint. Therefore, it does not refer to it in its analysis.

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 5

trial." *Id.* at 324. To defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. JR Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994). Summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable fact finder could return a verdict in its favor. *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1071 (9th Cir. 2019). When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

### B. Failure to Exhaust Administrative Remedies

As an initial matter, to the extent Hughes relies on circumstances surrounding his termination, or USPS's treatment of "light duty" employees, the Court will not consider those issues. A plaintiff brining claims under Title VII, the ADEA, and the Rehabilitation Act must first exhaust his administrative remedies. *See Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003) (Rehabilitation Act exhaustion requirement); *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099–100 (9th Cir. 2002) (Title VII); *Morgan v. Napolitano*, 988 F. Supp. 2d 1162, 1172 (E.D. Cal. 2013) (ADEA). Whether a plaintiff exhausted his remedies depends on the scope of the formal EEOC complaint, as well as "the scope of the EEOC's *actual* investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir.1994) (quotation omitted) (emphasis in original).

The EEOC considered issues related to the physical altercation between Hughes and Warden, as well as Hughes's attendance issues. Dkt. # 1, Ex. 1 at 2. Any discussion related to Hughes's termination—which occurred years after Hughes's EEOC complaints—or USPS's treatment of light duty employees is not properly before the Court and will not be considered.

### C. Discrimination Claims

Hughes asserts (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 *et seq.*; (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and (3) disability

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 6

1  discrimination in violation of Section 501 of the Rehabilitation Act of 1973, as amended, 29

2  U.S.C. § 791 *et seq.*[6]

3      Hughes's claims are all subject to the same evidentiary standard set forth in *McDonnell*

4  *Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Freyd v. Univ. of Oregon*, 990 F.3d

5  1211, 1228 (9th Cir. 2021). "The *McDonnell Douglas* framework contains three, burden-shifting

6  steps." *Id.* At the first step, the plaintiff must make a prima facie case of discrimination. *Fonseca*

7  *v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). Once a prima facie case is

8  established, the burden of production then shifts to the employer to articulate a legitimate,

9  nondiscriminatory reason for its action. *Id.* If the employer meets this burden, the plaintiff then

10  must produce sufficient evidence to raise a genuine issue of material fact as to whether the

11  employer's proffered nondiscriminatory reason is merely a pretext for discrimination. *Coleman*

12  *v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000). At summary judgment, the degree of

13  proof necessary to establish a prima facie case is "minimal and does not even need to rise to the

14  level of a preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir.

15  2002) (quotations omitted).

16      **i.    Disparate Treatment Claims**

17          **a.  Race and Age**

18      The Court first turns to plaintiff's disparate treatment claims. Plaintiff may demonstrate

19  racial discrimination under Title VII and age discrimination under the ADEA based on a theory

20  of disparate treatment, which occurs "where an employer has treated a particular person less

21  favorably than others because of a protected trait." *See Wood v. City of San Diego*, 678 F.3d

22  1075, 1081 (9th Cir. 2012) (Title VII); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th

23  Cir. 1990) (citation omitted) (ADEA).

24

25  _____

26  [6] Plaintiff asserts claims under "The Vocational Rehabilitation Act of 1973," (Dkt. # 1 ¶ 3.3), but the Act was replaced by the broader Rehabilitation Act. *See* Laura Rothstein, *Forty Years of Disability*

27  *Policy in Legal Education and the Legal Profession: What Has Changed and What Are the New Issues?*, 22 Am. U. J. Gender Soc. Pol'y & L. 519, 524 (2014). Therefore, the Court analyzes all disability claims

28  under the Rehabilitation Act.

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 7

1    To establish a prima facie case under Title VII and the ADEA, Hughes must show: (1) he

2    is a member of a protected class; (2) he performed his job satisfactorily; (3) he experienced an

3    adverse employment action; and (4) similarly situated individuals outside his protected class

4    were treated more favorably. *Freyd*, 990 F.3d at 1228; *see also O'Connor v. Consol. Coin*

5    *Caterers Corp.*, 517 U.S. 308, 312 (1996). Under the ADEA, plaintiff must also establish that

6    age was one of the "but for" causes of the challenged adverse employment action. *Black v.*

7    *Grant Cnty. Pub. Util. Dist.*, 820 F. App'x 547, 552 (9th Cir. 2020). The parties dispute the third

8    and fourth elements.

9    Hughes cannot show that he experienced adverse employment action. He does not

10    dispute the two letters of warning—one that was removed after six months and another that was

11    rescinded—are not adverse employment actions. *See* Dkt. # 37; *see also Ballard v. Donahoe*,

12    No. 2:11-CV-2576 JAM AC, 2014 WL 1286193, at *11 (E.D. Cal. Mar. 27, 2014) (holding that

13    a letter of warning without "accompanying adverse action, such as job loss, demotion, or

14    suspension" is not an adverse employment action). Instead, Hughes argues that the hostile work

15    environment he experienced is sufficient to show adverse employment action. Dkt. # 37 at 27;

16    *see Ray v. Henderson*, 217 F.3d 1234, 1244–45 (9th Cir. 2000) (a successful hostile work

17    environment claim may satisfy the adverse employment action prong in a discrimination claim).

18    As discussed in subsection iii, *infra*, Hughes fails to establish a hostile work environment claim,

19    and by extension, he fails to establish an adverse employment action.

20    Even if Hughes could show an adverse employment action, he cannot show that similarly

21    situated younger employees or employees of a different race were treated more favorably than

22    him. Hughes must point to at least a "single employee" outside his race and age who was

23    "similarly situated to [him] 'in all material respects' but who [was] given preferential treatment"

24    though he has a "similar job[] and display[s] similar conduct." *Campbell v. Hawaii Dep't of*

25    *Educ.*, 892 F.3d 1005, 1015 (9th Cir. 2018). Plaintiff does not offer any younger, non-Black

26    employees who received more favorable treatment despite displaying similar conduct. With

27    regard to the physical altercation, Hughes does not offer any comparators. The closest example

28    the Court can reference is Warden, a younger, white employee, who received harsher

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 8

1   disciplinary action for his role in the physical altercation. *Compare* Dkt. # 27, Ex. 25 (Hughes

2   received a letter of warning that was removed from his file after six months) *with id.*, Ex. 26 at 2

3   (Warden received a 14-day suspension without pay and a last chance agreement).

4          With regard to Hughes's absences, USPS has uniformly applied the absence policy to

5   two, non-Black employees. Hughes was issued a letter of warning after five unscheduled

6   absences (40 hours) within a three-month period. Dkt. # 27, Ex. 29. Hughes offers two

7   comparators: Scott Charbonneau and Richard Levings. [7] *Id.*, Ex. 1 at 55. Charbonneau, a 62-

8   year-old white co-worker, did not display similar conduct to Hughes. Charbonneau was issued a

9   letter of warning after seven unscheduled absences (56 hours) within a five-month period. *Id.*,

10  Ex. 41 at 4. Unlike Hughes, Charbonneau submitted a request for FMLA leave but his request

11  was denied (Dkt. # 28 ¶ 46), and his absences were less frequent, occurring over five months as

12  opposed to three months. *Id.* Levings, also a 62-year-old white co-worker, had five unscheduled

13  absences (40 hours) within an eight-month period and was not given a letter of warning because

14  his absences were less frequent than Hughes and Charbonneau. *See* Dkt. # 28 ¶ 48. Shimaura

15  also explained that Levings's absences did not display an "escalating" pattern like Hughes and

16  Charbonneau's absences. *Id.* ¶¶ 47–48. Therefore, Hughes's comparators, to the extent they

17  displayed similar conduct, did not receive preferential treatment sufficient to infer

18  discriminatory intent.

19         Viewed in light most favorable to Hughes, the evidence does not establish a prima facie

20  case of race-based or age-based discrimination. The claim fails at the first step on the

21  *McDonnell Douglas* framework, and this Court need not analyze the remaining steps. Summary

22  judgment is granted in favor of the defendant on this claim.

23         **ii.     Based on Disability**

24         To state a prima facie case under Section 501 of the Rehabilitation Act, a plaintiff must

25  "demonstrate that (1) [he] is a person with a disability, (2) who is otherwise qualified for

26  employment, and (3) suffered discrimination because of [his] disability." *Walton v. United*

27  ────────────────

28         [7] Hughes does not offer any younger comparators.

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 9

*States Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007). Disparate treatment of a disabled person is actionable. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). A plaintiff need only demonstrate that his disability was a "motivating factor" behind the discrimination. *Womanchild v. Nicholson*, No. C06-1823RAJ, 2008 WL 714091, at *3 (W.D. Wash. Mar. 13, 2008). At this stage, the Court assumes that Hughes is a person with disability who is otherwise qualified for employment. The remaining element is whether Hughes faced discrimination based on his disability.

Hughes argues, without support, that he was discriminated against because his conflict with Warden "related to his light duty and disability" and there is "no legitimate . . . non-discriminatory explanation for an employe[r] allowing that." Dkt. # 37 at 23. However, Hughes was on light duty the entire time he worked with Warden, and they worked together for two years prior to the election with no issues. *Id.*, Ex. 1 at 15–16; Dkt. # 28 ¶ 8. Hughes does not point to any evidence linking his conflict with Hughes to any discriminatory intent. Because Hughes offers no evidence from which a reasonable jury could conclude that his disability was a motivating factor behind any discrimination he suffered, he fails to establish a prima facia case of disability discrimination. Summary judgment is granted in favor of the defendant on this claim.

### iii.     Hostile Work Environment Claim

The Court now turns to plaintiff's hostile work environment claim. Discrimination under Title VII and the Rehabilitation Act also "encompasses the creation of a hostile work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (Title VII guarantees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult"); *Mattioda v. Nelson*, 98 F.4th 1164, 1173–74 (9th Cir. 2024) (Rehabilitation Act). To prevail on a hostile work environment claim, plaintiff must show discriminatory conduct (based on race or disability) that "was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Mattioda*, 98 F.4th at 1173–74 (Rehabilitation Act); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). The alleged conduct must be both subjectively and objectively hostile. *See Hosea v. Donley*, 584 F. App'x 608, 611

1   (9th Cir. 2014). To determine whether conduct was objectively hostile, "[w]orkplace conduct is

2   to be viewed cumulatively and contextually, rather than in isolation." *Sharp v. S&S Activewear,*

3   *L.L.C.*, 69 F.4th 974, 978 (9th Cir. 2023). For example, courts consider "the frequency of the

4   discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

5   mere offensive utterance; and whether it unreasonably interferes with an employee's work

6   performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). Offensive

7   conduct, isolated incidents, and "teasing" is typically insufficient to establish a hostile work

8   environment. *Sharp*, 69 F.4th at 978.

9          Here, Hughes fails to show that any severe or pervasive conduct he received was related

10  to his race or disabilities. *See generally* Dkt. # 37. As to his hostile workplace claim based on

11  disability, Hughes contends that (1) Shimaura sent a private email after Hughes and Warden's

12  physical altercation, referring to both employees as "Dumb and Dumber" and "knuckleheads,"

13  and (2) Warden called Hughes "fat" and "lazy." Dkt. # 37 at 22–23. As to both comments, the

14  Court is unpersuaded that they were motivated by Hughes's disability. Shimaura's email

15  referred to both Warden and Hughes the same way after they both got into a physical altercation

16  even though there is no evidence that Warden is disabled. *See* Dkt. # 27, Ex. 27 at 5. Similarly,

17  Warden's comments appear to have been motivated by the personal conflict he had with Hughes

18  regarding union-related disagreements, where they both called each other offensive names. *See*

19  Dkt. # 27, Ex. 1 (Hughes admits he called Warden a "bald-headed mother——"). Absent any

20  evidence of discriminatory intent, Hughes did not meet his burden to show a prima facie case.

21         As to Hughes's hostile workplace claim based on race, he argues that Warden got a

22  "pass" for his role in the physical altercation, presumably because he is white. Dkt. # 37 at 25.

23  However, Warden received 14-day suspension and a last-chance agreement because the

24  investigation revealed that he may have been the initial aggressor. Dkt. # 27, Ex. 26 at 2.

25  Hughes's subjective belief that Warden did not get harsh enough punishment, without more, is

26  irrelevant to a hostile work environment claim. Therefore, Hughes fails to establish a prima facie

27  case of hostile work environment. Summary judgment is granted in favor of the defendant.

28         **iv.    Retaliation Claim**

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 11

1    Finally, the Court turns to Hughes's retaliation claim. Title VII and the Rehabilitation Act
2    prohibit employers from retaliating against employees who "oppose" discriminatory
3    employment practices based on race or disability. *See E.E.O.C. v. Dinuba Med. Clinic*, 222 F.3d
4    580, 586 (9th Cir. 2000). To establish a prima facie case of retaliation, plaintiff must allege that
5    (1) he engaged in a protected activity, (2) his employer subjected him to an adverse employment
6    action, and (3) there is a causal link between the protected activity and the adverse action.
7    *Villiarimo v. Aloha Island Air, Inc*., 781 F.3d 1054, 1064 (9th Cir. 2002) (Title VII); *Coons v.*
8    *Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (Rehabilitation Act). A
9    "materially adverse action" is one that "might have dissuaded a reasonable worker from making
10   or supporting a charge of discrimination." *Burlington N. & Santa Fe Rwy. Co. v. White*, 548
11   U.S. 53, 68 (2006) (quotations and citations omitted). "Ostracism by co-workers does not
12   constitute an adverse employment action," but actions such as lateral transfers, scheduling
13   changes, bad performance reviews, and suspensions may be adverse employment actions. *Ray v.*
14   *Henderson*, 217 F.3d 1234, 1240–42 (9th Cir. 2000) (collecting cases).

15   Hughes contends that USPS retaliated against him for filing two EEO complaints and for
16   participating in at least two other EEO complaints in support of his co-workers. *See* Dkt. # 1 ¶
17   2.2, 2.17, 2.21, 2.22; *see also* Dkt. # 37 at 12. He alleges that USPS retaliated against him by (1)
18   failing to investigate and terminate Warden for harassing Hughes, (2) not changing Hughes's
19   work schedule to avoid future interactions with Warden, (3) threatening to discipline Hughes for
20   taking pictures of mail, (4) Shimaura's failure to file an injury report for Hughes's fear and
21   anxiety, and (5) failing to discipline Shimaura for his email referring to Warden and Hughes as
22   "knuckleheads." Dkt. # 37 at 15–18, 27–28. At this stage, the Court assumes that Hughes's EEO
23   activities are protected.

24   The Court is unpersuaded that the actions Hughes cites are "materially adverse" as to
25   dissuade a reasonable worker from being involved in EEO proceedings in the future. *See*
26   *Burlington*, 548 U.S. at 68. Even if they are, Hughes does not present any evidence to establish a
27   causal link between the protected activity and the adverse actions he points to. His conclusory
28   assertion that no non-discriminatory reasons exist to justify USPS's actions is not enough to

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 12

defeat summary judgment. *See Hansen*, 7 F.3d at 138 (holding that the nonmoving party cannot rely on unsupported conclusory allegations to defeat summary judgment). Viewing the evidence in light most favorable to Hughes, he fails to establish a prima facie case of retaliation. Summary judgment is granted in favor of the defendant.

### III.   Conclusion

For all the foregoing reasons, defendant's motion for summary judgment (Dkt. # 26) is GRANTED. The Clerk of Court is directed to enter judgment for the defendant and against plaintiff. Defendant's "Motion to Exclude Expert Opinions" (Dkt. # 31) is DISMISSED AS MOOT.

IT IS SO ORDERED.

DATED this 26th day of August, 2024.

Robert S. Lasnik
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 13